UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

GREGORY BARNES,                                :

               Petitioner,          :          **MEMORANDUM DECISION**

         - v -                            :          20-cv-516 (DC)

THE PEOPLE OF THE STATE          :
OF NEW YORK,

                     :

               Respondent.

                     :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

APPEARANCES:                        GREGORY BARNES
                              Petitioner *Pro Se*
                              17-A-1413
                              Attica Correctional Facility
                              639 Exchange Street, A-4-31
                              Attica, New York 14011

                              TIMOTHY D. SINI, Esq.
                              District Attorney, Suffolk County
                              By:    Rosalind C. Gray, Esq.
                                     Assistant District Attorney
                              200 Center Drive
                              Riverhead, New York 11901
                                     Attorney for Respondent

CHIN, Circuit Judge:

        On March 17, 2017, following a jury trial, Petitioner Gregory Barnes was

convicted in County Court, Suffolk County (Cohen, *J.*), of assault in the second degree,

a class D felony.  Dkt. 9-1 at 22, 33; N.Y. Penal Law § 120.05 ("Assault in the second

degree is a class D felony.").  The court determined that Barnes was a persistent violent felony offender and sentenced him to an indeterminate sentence of 19 years to life, Dkt. 9-19, at 2, 10.  The Appellate Division, Second Department, affirmed Barnes's conviction and sentence, *People v. Barnes*, 96 N.Y.S.3d 861 (2d Dep't 2019) ("*Barnes I*"), and the New York Court of Appeals denied leave to appeal, *People v. Barnes*, 129 N.E.3d 342 (N.Y. 2019) (Garcia, *J.*) ("*Barnes II*").

On January 27, 2020, Barnes, proceeding *pro se*, petitioned this Court for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 (the "Petition").  Dkt. 1.  Barnes raises four grounds in his Petition: (1) the People failed to prove the elements of assault in the second degree, and therefore, the conviction was against the weight of the evidence; (2) the trial court committed reversible error in failing to suppress his statements to law enforcement; (3) he was deprived of effective assistance of counsel; and (4) his sentence was unduly harsh and excessive.  *Id.* at 5-9.  Barnes raised these same arguments before the Appellate Division, Second Department.  Dkt. 9-1 at 19-20, 27-58.

The Suffolk County District Attorney's Office opposed the Petition on June 14, 2021.  Dkt. 10.

On April 9, 2024, the case was reassigned to the undersigned.

For the reasons that follow, the Petition is DENIED.

*STATEMENT OF THE CASE*

**A.** *The Facts¹*

The evidence at trial established the following:

**1.** *The Altercation*

On November 7, 2015, Barnes and his girlfriend, Joyce Thomas, visited their friend Linda Brown's house.  Dkt. 9-1 at 92.  The couple arrived around 11 a.m. and spent the next few hours drinking beer and liquor in Brown's bedroom on the second floor.  *Id.*

Around 1:30 p.m., Barnes was ready to leave the house, but Thomas was not prepared to go yet.  *Id.*  Barnes became upset, stormed out of the room, and left the house.  Thomas and Brown remained in the room.  About twenty minutes later, Thomas decided she was ready to go.  *Id.*  She reached the bottom of the staircase and saw Barnes by the front door.   *Id.* at 92-93.

Barnes approached Thomas, "put his hands on her chest and pushed her back, onto the stairs, causing her to fall backward[]."  *Id.* at 93.  Thomas jumped up, grabbed the neck of Barnes's shirt, and asked him what he was doing.  Barnes pulled out a knife and stabbed Thomas in the right back side of her neck.  Thomas began to

---

¹ The facts are drawn primarily from Respondent's opposition memorandum before the Appellate Division, which provides detailed citations to the trial transcripts.  Dkt. 9-1 at 77, 92-108.  The evidence at trial is construed in the light most favorable to the prosecution.  *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

bleed.  She later described the sensation "as cold" and "like a burn."  *Id.*  After being

stabbed, Thomas grabbed Barnes's hand, which was moving in a downward motion, to

prevent him from stabbing her again.  *Id.*  In an angry tone, Barnes accused Thomas of

messing around with other men.  Thomas denied the accusation and continued to hold

Barnes's hand with the knife away from her body.  *Id.*

During the altercation, Brown and a third woman, Monica, had come

downstairs.  Brown saw Barnes stab Thomas in the neck.  Brown grabbed Barnes's arm,

pried the knife from his hand, and told him to leave her house.  Barnes was wearing

blue jeans and a baseball cap.  *Id.*

Immediately after the altercation, Thomas and Brown called 911.  *Id.*  They

reported that Thomas's boyfriend had cut her neck and head with a knife; they also

reported that Barnes had left the house.  *Id.* at 93-94.  Although the first call

disconnected after they explained the altercation, the 911 operator called back and

obtained a description of Barnes and his name.  *Id.* at 94.  Thomas and Barnes described

Barnes as "a black male, in his 40s or 50s, wearing a blue hat and blue jeans."  *Id.*  They

advised that his name was Gregory Barnes, and he had left the house and headed

southbound towards Bay Shore Road.  They also advised that he had left the knife at

the house.  *Id.*

4

2.      *The Police and Medical Response*

Suffolk County Police Officer Donald Dillon responded to the 911 call and arrived at Brown's house around 1:43 p.m.  *Id.*  He was the first officer on the scene.  As Officer Dillon parked his patrol car, Thomas approached him with her hand on her neck.  "Her hair was matted from the blood, which was dripping down her neck and onto her shirt." *Id.*  Thomas, visibly upset, told Officer Dillon that her boyfriend, Gregory Barmes, had stabbed her in the neck.  She also told Officer Dillon where Barnes lived. *Id.*  Officer Dillon proceeded to relay the information over the radio. *Id.* at 95.  As he did, Brown came out of her house and attempted to give him "a wooden handled knife, with a serrated edge, very similar in appearance to a steak knife." *Id.*  Officer Dillon directed Brown to put the knife back where she got it from because it was part of an active crime scene.  Brown continued to try to give him the knife, but she eventually complied; she went back and put the knife on a green chair outside of her house. *Id.*

Joseph Danisi, a critical care emergency medical technician ("EMT") and Deer Park Fire Department paramedic, responded to the scene with his partner. *Id.* at 95-96.  They observed Thomas standing with her hand over her neck.  She had a two-inch-long laceration on her neck, and her hair was matted with blood. *Id.* at 96.  Thomas had managed to control the bleeding by applying pressure to the wound area.  Danisi and his partner treated Thomas. *Id.*  Danisi determined that Thomas had a soft-tissue injury, bleeding, and hemorrhaging, but she was stable. *Id.*

Thomas was placed inside the ambulance, and Danisi put gauze on her neck.  He applied pressure to the laceration and sealed the wound.  *Id.*  He started an IV, did an EKG, and gave Thomas oxygen.  He also did a head-to-toe examination to determine whether there were any other injuries.  *Id.*  Thomas was then taken to Southside Hospital.  Officer Dillon followed the ambulance in his patrol car and remained at the hospital while Thomas was treated in the emergency room.  *Id.*  At the hospital, Thomas was in visible pain.  She described her pain as being "100%" and advised that she had a headache, a stinging sensation, and felt as if she was losing her memory.  *Id.* at 96-97.  She briefly lost consciousness.  *Id.*  She received staples for her wound.

Dr. Jay Yelon was the trauma surgeon on call on the day of the altercation.  *Id.*  His initial assessment of Thomas revealed that she did not have any immediate life-threatening injuries; however, she did have a stab wound to her neck.  The laceration was about two inches in length and located in the uppermost part of the neck, toward the rear base of her skull.  *Id.* at 98.  She also had a bruise on the middle part of the right side of her neck.  For her wound, Thomas received two staples, pain medication, and antibiotics.  *Id.*  The knife recovered from Brown's house was consistent with something that could have caused Thomas's injuries.  *Id.*

3.      *The Identification and Initial Statements*

Around 1:37 p.m. the day of the altercation, Suffolk County Police Officer

Patrick Kerley was notified of a violent domestic incident, possibly involving a knife.

Before arriving at Brown's house, he heard over the radio that another officer was

already at the crime scene.  Accordingly, at the crime scene, he remained in his car.  *Id.*

at 99.

Officer Kerley then began canvassing the area for the suspect, who only

lived a block away.  *Id.*  He was driving southbound on Washington Avenue when he

noticed an individual with a blue hat walking from Washington Avenue to Bay Shore

Road.  *Id.*  As he got closer and pulled over his car, he saw that the person fit the

description -- a black male in his 40s or 50s, wearing blue jeans and a blue hat.  Officer

Kerley asked the man for his name, and the man identified himself as Gregory Barnes.

*Id.*  After Barnes identified himself, Officer Kerley asked Barnes to show his hands and

place them on the police car.  Officer Kerley then exited his car and patted Barnes down.

Officer Drayton arrived as Officer Kerley was patting down Barnes.  Officer Kerley then

placed Barnes in handcuffs in his car as he waited for more information from the

officers at Brown's house.  *Id.*

Officer Kerley was eventually directed to bring Barnes back to Brown's

house for identification.  *Id.* at 100.  They arrived at 1:52 p.m.  As they were sitting in the

car, Officer Drayton approached the passenger-side window holding the knife

7

recovered from Brown's house.  Before Officers Kerley and Drayton could say anything, Barnes stated, "Yeah, that's the knife." *Id.*  Officer Drayton then placed the knife in the front-passenger seat of Officer Kerley's car.

####        4.        *The Continued Investigation*

Detective Collins was at the precinct when he heard a radio call around 1:30 p.m. about a stabbing at Brown's house.  *Id.*  He went to Brown's house to view the scene and meet with any officers or witnesses still there.  *Id.* at 100-01.  He took a written statement from Brown; he also spoke with Monica.  *Id.* at 101.  Detectives Collins and Hughes then went to Southside Hospital to talk to Thomas.  They took her statement and photographed her injury as she was in a bed in the emergency trauma room.  *Id.*

####        5.        *The Interview at the Precinct*

Around 5:20 p.m., Detective Collins met with Barnes in an interview room at the precinct.  *Id.*  Detectives Collins and Hughes introduced themselves, and Detective Collins read Barnes his *Miranda* rights out loud from a card.  *Id.* at 102. Detective Collins also placed the card on the table in front of Barnes, where he could read along.  There were four statements on the card, and after each statement, Detective Collins asked Barnes to initial next to the sentence to indicate that he understood that statement.  *Id.*  Barnes did so for each statement and did not assert or suggest that he did not understand them.  No promises were made to Barnes in exchange for signing

his initials, and he was not threatened.  Neither detective had a weapon in the interview room.  *Id.*

After reading Barnes his *Miranda* rights, Detective Collins moved to the waiver portion of the card.  *Id.*  He read two questions verbatim from the card about whether Barnes understood his rights and whether he wanted to speak with the detectives.  Barnes answered in the affirmative, indicating that he understood his rights and wished to speak to the detectives.  *Id.*  He also wrote "yes" next to each question.  *Id.*

Barnes then initialed at the bottom of the card.  Detective Collins also signed his name, shield, and time at the bottom of the card.  *Id.*  Again, no promises were made to Barnes in exchange for signing his initials, and he was not threatened.  *Id.* at 102-03.

After finishing with the rights card, Detective Collins and Barnes had a conversation that lasted about five minutes.  During the conversation, Barnes told Detective Collins: (1) he lived at 20 Washington Avenue, in Deer Park, NY; (2) he knew Thomas for three months; (3) he and Thomas went to Brown's house because Thomas wanted to smoke crack there; (4) he brought the knife from his house to Brown's house; (5) he went upstairs in Brown's house to look for Thomas; (6) when he opened the bathroom door, he saw Thomas performing oral sex on a man that he knew was a drug dealer but that he did not know his name; (7) he hit Thomas on her face and stabbed her in the neck; and (8) Brown came downstairs and took the knife from him, and he left.

9

*Id.* at 103.  But later in the conversation, he stated that (1) Thomas had pulled out the

knife and got stabbed during the tussle, and (2) the knife came from Brown's kitchen,

not from his house.  *Id.*

Detectives Collins and Hughes, thinking the conversation was over, got

up and told Barnes that they were stepping out of the room for a few minutes.  *Id.* at

104.  Before they exited the room, Barnes told them that he had identified the knife to

the other officers.  The detectives left the room, and Detective Collins went to his desk

and typed a statement based on the conversation.  *Id.*  As Detective Collins typed the

statement, Detective Hughes photographed and took DNA swabs of the blood from the

knife.  The swabs were placed in a sealed envelope and box and sent to the Suffolk

County Crime Laboratory for analysis.  *Id.*  Once the statement was ready, Detective

Collins returned to the interview room with Barnes.  *Id.*

Detective Collins placed the two-page typewritten statement on the table

before Barnes.  He again stood behind Barnes as he read the top portion of the form,

"Your Rights," out loud while Barnes read along.  *Id.*  The top portion of the statement

had the same four statements as the *Miranda* card.  He reviewed each statement with

Barnes individually; after each, Barnes wrote his initials to acknowledge his

understanding of the statement.  He did not ask Detective Collins to reread or reexplain

any of the statements.  *Id.* at  104-05.  Again, no promises were made to Barnes in

exchange for signing his initials, and he was not threatened.  *Id.* at 105.

Detective Collins next reviewed the second section, "Waiver of Rights,"
with Barnes.  *Id.*  This section consisted of the same two questions as the *Miranda* card.
For the second time, Barnes indicated that he understood the rights and wished to
speak with the detectives.  He wrote "yes" next to each question and signed his name in
the indicated space.  Detectives Collins and Hughes both signed the statement.  *Id.*
Barnes then signed two more times – one time at the bottom of the first page and a
second time at the end of the typewritten portion of the second page.  The interview
ended at 5:55 p.m.  *Id.*

**6.**     ***The Fingerprint and Blood Testing***

On March 30, 2016, Detective John Kellman, a latent print examiner and
crime scene investigator, received a sealed box containing the knife Barnes used to stab
Thomas and brought the items to his lab for examination.  *Id.* at 105-06.  During the
examination, he noted that the knife brand was "Rogers."  The knife was about ten
inches long, with a six-inch blade.  *Id.* at 106.  Detective Kellman performed three
different tests on the knife to test for fingerprints.  The tests did not reveal any
fingerprints.  *Id.*  After completing the testing, he put the knife back in the box, sealed
it, and placed it in a secure location.  *Id.* at 106-07.

Karen Galindo, a forensic scientist at the Suffolk County Crime
Laboratory, performed analyses on evidence related to the stabbing at Brown's house.
*Id.* at 107.  Two swabs from the blade of the knife and buccal swab samples taken from

11

Thomas and Brown were submitted to the crime lab for biological examination.  The

blade of the knife tested positive for the presence of blood, and Galindo, after using a

technique called STR (Short Tandem Repeats), obtained a DNA profile from the stain

from the swab of the knife blade.  *Id.* at 107-08.  She then compared that profile to the

samples taken from Thomas and Brown.  The DNA profile on the knife blade matched

that of Thomas.  *Id.* at 108.

**B.**     ***Procedural History***

     **1.**     ***State-Court Proceedings***

          **a.**     *The Indictment*

A grand jury charged Barnes with assault in the second degree, a class D

felony, and assault in the third degree, a class A misdemeanor.  Dkt. 9-1 at 4.

          **b.**     ***The Huntley Hearing***

On September 16, 2016, the trial court held a hearing to determine the

admissibility of five statements made by Barnes to police officers: "(1) 'My name is

Gregory Barnes'; (2) 'I just stabbed her'; (3) 'Yeah, that's the knife'; (4) a two-page written

statement taken by Detective Collins at the First Precinct; and[] (5) [Barnes's] statement

that he wanted to kill himself and [Joyce Thomas]."  Dkt. 10 at 2.

One month later, the court issued its written decision.  The court

precluded two statements: (1) the oral statement regarding Barnes's suicidal and

homicidal thoughts and (2) Barnes's admission that he stabbed Joyce Thomas.  *Id.* at 8.
The remaining statements were deemed admissible.  *Id.*

> **b.**    *The Trial, Conviction, and Sentence*

Trial commenced on January 4, 2017.  Dkt. 9-1 at 33. The People rested on
January 27, 2017.  *Id.* at 108.  Barnes did not present a case; however, his counsel
"requested that the lesser-included charges of Attempted Assault in the Second Degree
and Assault in the Third Degree be submitted to the jury." *Id.*  The court denied the
request.  *Id.*  Four days later, the jury found Barnes guilty of assault in the second
degree, a class D felony.  *Id.*  At sentencing on March 17, 2017, the court determined that
Barnes was a persistent violent felony offender and sentenced him to an indeterminate
sentence of 19 years to life.  *Id.* at 109; Dkt. 9-19 at 2, 10.  The court entered judgment the
same day, Dkt. 9-1 at 14.

> **b.**    *The Direct Appeal*

Barnes appealed his conviction to the Appellate Division, Second
Department.  Dkt. 9-1 at 62.  He argued the following: (1) the People failed to prove the
elements of assault in the second degree, and therefore, the conviction was against the
weight of the evidence; (2) the trial court committed reversible error in failing to
suppress his statements to law enforcement; (3) he was deprived of effective assistance
of counsel; and (4) his sentence was unduly harsh and excessive.  *Id.* at 19-20, 27-58.

13

On April 17, 2019, the Appellate Division affirmed Barnes's conviction and sentence. *Barnes I*, 96 N.Y.S.3d at 861.  It adjudicated each claim on the merits and held: (1) Barnes's statement at the police station was "voluntarily made after he knowingly, intelligently, and voluntarily waived his *Miranda* rights"; (2) Barnes failed to preserve his sufficiency-of-the-evidence argument, and even if he had preserved it, the evidence was legally sufficient to establish his guilt beyond a reasonable doubt; (3) Barnes "failed to establish that he was deprived of the effective assistance of counsel"; and (4) Barnes's sentence was not excessive. *Id.* at 861-62 (citations omitted).

Two months later, on June 18, 2019, the New York Court of Appeals (Garcia, *J.*) denied Barnes's application for leave to appeal. *Barnes II*, 129 N.E.3d at 342.

### 2.  *The Petition*

On January 27, 2020, Barnes, proceeding *pro se*, filed the Petition pursuant to 28 U.S.C. § 2254.  Dkt. 1.  Barnes raises four grounds in his Petition: (1) the People failed to prove the elements of assault in the second degree, and therefore, the conviction was against the weight of the evidence; (2) the trial court committed reversible error in failing to suppress his statements to law enforcement; (3) he was deprived of effective assistance of counsel; and (4) his sentence was unduly harsh and excessive. *Id.* at 5-9.

The Suffolk County District Attorney's Office opposed the Petition on June 14, 2021.  Dkt. 10.

On October 18, 2021, pursuant to Rule 41(a)(2) of the Federal Rules of Civil Procedure, Barnes moved to voluntarily dismiss the Petition because his ineffective-assistance-of-counsel claim was not fully exhausted.  Dkt. 15.  The court (DeArcy Hall, *J.*) construed the motion as a request to stay the proceedings pending the exhaustion of the claim; it granted the motion and stayed the case.  Dkt. Entry Dated 10/28/2021.

Barnes moved "to restart his case" on June 10, 2022.  Dkt. 16.  Neither he nor the People have indicated that he returned to state court to file a motion pursuant to N.Y. Crim. Proc. Law § 440.  Six days later, the court granted the motion and reopened the case; it also directed Barnes to file a response to the People's opposition memorandum by July 15, 2022.  Dkt. Entry Dated 6/16/2022.  Barnes did not comply.

On April 9, 2024, the case was reassigned to the undersigned.

## DISCUSSION

### I.   *Federal Review of State Convictions*

#### A.   *Applicable Law*

A federal court may not grant a habeas petition on a claim that was adjudicated on the merits in state court unless that adjudication:

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see Harrington v. Richter*, 562 U.S. 86, 97-98 (2011); *Waiters v. Lee*, 857 F.3d 466, 477 (2d Cir. 2017).  "[A] state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits[]' and (2) reduces its disposition to judgment."  *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (second alteration in original) (citing 28 U.S.C. § 2254(d)(1)).  Hence, when a claim is adjudicated on the merits, the state court's decision must be "accorded substantial deference."  *Fischer v. Smith*, 780 F.3d 556, 560 (2d Cir. 2015) (citing *Dolphy v. Mantello*, 552 F.3d 236, 238 (2d Cir. 2009)).  "A federal court may reverse a state court ruling only where it was 'so lacking in justification that there was . . . [no] possibility for fairminded disagreement.'"  *Vega v. Walsh*, 669 F.3d 123, 126 (2d Cir. 2012) (per curiam) (quoting *Harrington*, 562 U.S. at 103); *see also Wetzel v. Lambert*, 565 U.S. 520, 524 (2012) (per curiam) (quoting *Harrington*, 562 U.S. at 102).

A federal court cannot review a habeas petition unless the petitioner "has exhausted the remedies available" in state courts.  28 U.S.C. § 2254(b)(1)(A).  This requirement affords state courts the "opportunity to pass upon and correct alleged violations of its prisoners' federal rights."  *Jackson v. Edwards*, 404 F.3d 612, 619 (2d Cir. 2005) (quoting *Picard v. Connor*, 404 U.S. 270, 275 (1971)).  "This requires that the prisoner 'fairly present' his constitutional claim to the state courts, which he accomplishes 'by presenting the essential factual and legal premises of his federal constitutional claim to the highest state court capable of reviewing it.'"  *Jackson v.*

16

*Conway*, 763 F.3d 115, 133 (2d Cir. 2014) (quoting *Rosa v. McCray*, 396 F.3d 210, 217 (2d Cir. 2005)).

Moreover, "federal courts will not review questions of federal law presented in a habeas petition when the state court's decision rests upon a state-law ground that 'is independent of the federal question and adequate to support the judgment.'" *Cone v. Bell*, 556 U.S. 449, 465 (2009) (quoting *Coleman v. Thompson*, 501 U.S. 722, 729 (1991)).  In other words, if the state court refused to consider an argument because it was procedurally barred under state law, the argument is barred from federal habeas review so long as the procedural bar is "adequate to support the judgment." *Murden v. Artuz*, 497 F.3d 178, 191-92 (2d Cir. 2007) (quoting *Jimenez v. Walker*, 458 F.3d 130, 138 (2d Cir. 2006)).  For an independent and adequate state ground to bar habeas relief, the state court rendering the judgment must "clearly and expressly state[] that its judgment rests on a state procedural bar." *Whitley v. Ercole*, 642 F.3d 278, 286 (2d Cir. 2011) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996)).

If a claim is procedurally barred pursuant to an independent and adequate state rule, a federal habeas court may not review it on the merits unless the petitioner demonstrates (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law," or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman*, 501 U.S. at 750.

**B.**      *Analysis*

Barnes raises four grounds in his Petition: (1) the People failed to prove the elements of assault in the second degree -- that is, his conviction was not supported by legally sufficient evidence; (2) the trial court committed reversible error in failing to suppress his statements to law enforcement; (3) he was deprived of effective assistance of counsel; and (4) his sentence was unduly harsh and excessive.  *Id.* at 5-9.  I address each argument in turn.

**a.**      *Procedural Bar*

A review of Barnes's brief on direct appeal, Dkt. 9-11 at 20, 27-58, and the Appellate Division's decision, *Barnes I*, 96 N.Y.S.3d at 861, shows that he raised all four grounds on direct appeal.

As to ground one, the Appellate Division, citing New York law, held that Barnes failed to preserve this argument for appellate review.  *Barnes I*, 96 N.Y.S.3d at 862 (citing N.Y. Crim. Proc. Law § 470.05(2)).

Habeas relief is thus not available to Barnes on ground one.  For an independent and adequate state ground to bar habeas relief, the state court rendering the judgment must "clearly and expressly state[] that its judgment rests on a state procedural bar."  *Whitley*, 642 F.3d at 286 (quoting *Glenn*, 98 F.3d at 724).  Here, the Appellate Division clearly and expressly stated that ground one was precluded by state law.  *Barnes I*, 96 N.Y.S.3d at 862 (citing N.Y. Crim. Proc. Law § 470.05(2)).

18

Moreover,  Barnes has failed to demonstrate that he is entitled to an exception to the procedural default rule on ground one because he has not shown either (1) "cause for the default and actual prejudice as a result of the alleged violation of federal law" or (2) "that failure to consider the claims will result in a fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

Accordingly, ground one is procedurally barred.  Barnes, however, is not procedurally barred from raising grounds two through four.[2]

**b.**   *The Merits*

**1.**   *Ground One*

Although ground one is procedurally barred,  I consider it on the merits nonetheless.  Barnes asserts that the People failed to prove the elements of assault in the second degree -- that is, his conviction was not supported by legally sufficient evidence. Dkt. 1 at 5.  Specifically, he contends that the People failed to prove "a physical injury by means of a dangerous instrument."  *Id.*

In addressing this assertion, the Appellate Division held (1) in "viewing the evidence in the light most favorable to the prosecution, we find that it was legally sufficient to establish the defendant's guilt of that crime beyond a reasonable doubt,"

---

[2] Although Barnes did not return to state court to file a § 440 motion, he did present his ineffective-assistance-of-counsel claim on direct appeal, and it was considered on the merits.  *See Barnes I*, 96 N.Y.S.3d at 862.

and (2) "[u]pon reviewing the record here, we are satisfied that the verdict of guilt on that conviction was not against the weight of the evidence." *Barnes I*, 96 N.Y.S.3d at 862 (citations omitted). Because this claim was adjudicated on the merits, the state court's decision must be "accorded substantial deference." *Fischer*, 780 F.3d at 560 (citing *Dolphy*, 552 F.3d at 238).

"The requirement that guilt of a criminal charge be established by proof beyond a reasonable doubt dates at least from our early years as a Nation." *In re Winship*, 397 U.S. 358, 361 (1970). In evaluating a sufficiency-of-the-evidence claim on habeas review, a federal court must review all the evidence in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319. The court must affirm the verdict if "any rational trier of fact could have found the essential elements of the charged crime beyond a reasonable doubt." *United States v. Rutigliano*, 790 F.3d 389, 400 (2d Cir. 2015) (citing *United States v. Desnoyers*, 637 F.3d 105, 109 (2d Cir. 2011)). In considering a petition based on the sufficiency of evidence to support a state criminal conviction, the court defers to the jury's assessment of "the weight of the evidence [and] the credibility of witnesses." *Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (citations omitted).

If the facts support conflicting inferences, the court "must presume -- even if it does not affirmatively appear in the record -- that the trier of fact resolved any such conflicts in favor of the prosecution[] and must defer to that resolution." *Jackson*, 443 U.S. at 326. Thus, a habeas "petitioner bears a very heavy burden in convincing a

federal *habeas* court to grant a petition on the grounds of insufficiency of the evidence."

*Fama v. Comm'r of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000) (citing *United States v.*

*Soto*, 716 F.2d 989, 991 (2d Cir. 1983)).  Indeed, a federal court may overturn a state court

decision rejecting a sufficiency-of-the-evidence claim only if the state court decision was

"objectively unreasonable."  *Coleman v. Johnson*, 566 U.S. 650, 651 (2012) (per curiam)

(citation omitted).  Moreover, the "court[] must look to state law for 'the substantive

elements of the criminal offense.'"  *Id.* at 655 (citation omitted).

   Under New York law, a person is guilty of assault in the second degree

when "[w]ith intent to cause physical injury to another person, he causes such injury to

such person or to a third person by means of a deadly weapon or a dangerous

instrument."  N.Y. Penal Law § 120.05(2).  The relevant terms have the following

meanings:

> 9. "Physical injury" means impairment of physical condition or substantial
> pain.
>
> . . .
>
> 13. "Dangerous instrument" means any instrument, article or substance,
> including a "vehicle" as that term is defined in this section, which, under
> the circumstances in which it is used, attempted to be used or threatened
> to be used, is readily capable of causing death or other serious physical
> injury.

*Id.* § 10.00(9), (13).

   Here, Barnes has not demonstrated that the evidence presented at trial

was insufficient to support a conviction of assault in the second degree.  Instead, a

review of the evidence shows that it was more than sufficient to support his conviction.

The relevant evidence established the following:

- The altercation began because Barnes was upset that Thomas did not want to leave Brown's house, Dkt. 9-1 at 92-93;
- As Thomas walked down the stairs at Brown's house, Barnes approached her, "put his hands on her chest and pushed her back, onto the stairs, causing her to fall backward[]," *id.* at 93;
- Thomas jumped up and grabbed the neck of Barnes's shirt and asked him what he was doing; Barnes then pulled out a knife and stabbed the back right side of Thomas's neck, *id.;*
- Brown witnessed Barnes stab Thomas in the neck, *id.;*
- Thomas called 911 and stated that Barnes pulled a knife on her and stabbed her neck, *id.* at 93-94;
- Thomas told Officer Dillon that Barnes had stabbed her in the neck, *id.* at 94;
- EMT Danisi determined that Thomas had a soft tissue injury, bleeding, and hemorrhaging, *id.* at 96;
- Because Thomas sustained a neck wound, her case was deemed advanced, *id.;*
- In the ambulance, Thomas described her pain as being "100%" and briefly lost consciousness, *id.* at 97;
- At the hospital, Thomas rated her pain as a 10 out of 10, *id.* at 98;
- Dr. Yelon noted that Thomas's laceration was two inches in length and located in the uppermost part of the neck, towards the rear of her skull, *id.;*
- Thomas received two staples for her wound, *id.;*
- Thomas's medical records indicated that it took four hours for her pain to go from a 10 out of 10 to a 5 out of 10, *id.;*
- Dr. Yelon testified, to a reasonable degree of medical certainty, that the knife recovered from Brown's house was consistent with something that could have caused Thomas's injury, *id.;* and
- The knife was about ten inches long, with a six-inch blade, *id.* at 106.

A rational jury surely could have concluded from these facts that Barnes intended to

and did cause physical injury to Thomas by means of a dangerous instrument.  N.Y.

Penal Law § 120.05(2).

Accordingly, Barnes is not entitled to habeas relief on this basis.

2. *Ground Two*

Barnes argues that the trial court committed reversible error in failing to

suppress his statements to law enforcement "given that there was insufficient evidence

to show that [he] fully comprehended the policy behind the [M]iranda warnings and

the implications of waiving his [M]iranda rights."  Dkt. 1 at 6.  The court determined

that the two-page written statement taken by Detective Collins at the First Precinct after

Barnes had waived his *Miranda* was admissible.  Dkt. 10 at 2, 8.[3]

In addressing this argument, the Appellate Division agreed that Barnes's

statement was "voluntarily made after [Barnes] knowingly, intelligently, and

voluntarily waived his *Miranda* rights."  *Barnes I*, 96 N.Y.S.3d at 862 (collecting cases).

---

[3] The court also determined that the following statements to police officers were admissible: (1) "My name is Gregory Barnes," and (2) "Yeah, that's the knife."  Dkt. 10 at 2, 8.  The first statement was made to Officer Kerley as he canvassed the area for the suspect in the stabbing at Brown's house.  Dkt. 9-1 at 99. As Officer Kerley drove southbound on Washington Avenue, he noticed an individual walking from Washington Avenue to Bay Shore Road that matched the description of the suspect that had been provided over the radio.  *Id.*  Officer Kerley asked the man for his name, and the man identified himself as Gregory Barnes.  *Id.*  Barnes was then placed in handcuffs and put in Officer Kerley's car.  *Id.*

The second statement was made in Officer Kerley's car at Brown's house, where Barnes was brought for identification.  *Id.* at 100.  As Barnes sat in Officer Kerley's car, Officer Drayton approached the passenger-side window holding the knife recovered from Brown's house.  Before Officers Kerley and Drayton could say anything, Barnes stated, "Yeah, that's the knife."  *Id.*

These statements were admissible and not subject to *Miranda* warnings.  *Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."); *see id.* ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding [in this case]."); *see also United States v. Chandler*, 164 F. Supp. 3d 368, 385 (E.D.N.Y. 2016) ("[W]here statements are spontaneous -- that is, where they are not the result of questioning or its functional equivalent -- *Miranda* warnings are not necessary and the statements are not protected." (quoting *United States v. Jacobson*, 4 F. Supp. 3d 515, 532 (E.D.N.Y. 2014))).

Because this claim was adjudicated on the merits, the state court's decision must be "accorded substantial deference." *Fischer*, 780 F.3d at 560 (citing *Dolphy*, 552 F.3d at 238).

"[I]f a person in custody is to be subjected to interrogation, he must first be informed in clear and unequivocal terms" that (1) "he has the right to remain silent," (2) "anything he says can be used against him in a court of law," (3) "he has the right to the presence of an attorney," and (4) if he cannot afford an attorney[,] one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 467-68, 479. Notably, "a suspect is entitled to Miranda warnings only if he or she is interrogated while 'in custody.'" *United States v. Chandler*, 164 F. Supp. 3d 368, 385 (E.D.N.Y. 2016) (alteration adopted) (quoting *Tankleff v. Senkowski*, 135 F.3d 235, 242 (2d Cir. 1998)).

Here, it is undisputed that Barnes was in custody when he was interrogated and made the challenged statement. Dkt. 9-1 at 101. Instead, the dispute focuses on whether Barnes understood the implications of waiving his *Miranda* rights. Dkt. 1 at 6. As held by the Appellate Division, the record makes clear that the statement was "voluntarily made after [Barnes] knowingly, intelligently, and voluntarily waived his *Miranda* rights." *Barnes I*, 96 N.Y.S.3d at 862 (collecting cases). The trial transcript belies Barnes's argument to contrary.

Before asking Barnes any questions, Detective Collins read Barnes his *Miranda* rights from a card. Dkt. 9-1 at 102. Detective Collins also placed the card on the table in front of Barnes, where he could see it and read along. Detective Collins read

the card out loud for Barnes.  There were four statements on the card, and after each

statement, Detective Collins asked Barnes to initial next to the sentence to indicate that

he understood that statement.  *Id.*  Barnes did so for each statement and did not assert

or suggest that he did not understand them.  No promises were made to Barnes in

exchange for signing his initials, and he was not threatened.  Neither detective had a

weapon in the interview room.  *Id.*

      After reading Barnes his *Miranda* rights, Detective Collins moved to the

waiver portion of the card.  *Id.*  He read two questions verbatim from the card about

whether Barnes understood his rights and whether he wanted to speak with the

detectives.  Barnes answered in the affirmative, indicating that he understood his rights

and wished to speak to the detectives.  *Id.*  He also wrote "yes" next to each question.  *Id.*

Barnes then initialed at the bottom of the card.  Detective Collins also signed his name,

shield, and time at the bottom of the card.  *Id.*  Again, no promises were made to Barnes

in exchange for signing his initials, and he was not threatened.  *Id.* at 102-03.

      Moreover, after transcribing Barnes's oral statement into a two-page

typewritten statement, Detective Collins placed it on the table before Barnes.  He again

stood behind Barnes as he read the top portion of the form, "Your Rights," out loud

while Barnes read along.  *Id.* at 104.  The top portion of the statement had the same four

statements as the *Miranda* card.  He reviewed each statement with Barnes individually;

after each, Barnes wrote his initials to acknowledge his understanding of the statement.

He did not ask Detective Collins to reread or reexplain any of the statements.  *Id.* at 104-05.  Again, no promises were made to Barnes in exchange for signing his initials, and he was not threatened.  *Id.* at 105.

In sum, the record is devoid of any evidence that suggests that Barnes could not comprehend or was unaware of the implications of waiving his *Miranda* rights.

Accordingly, Barnes is not entitled to habeas relief on this basis.

### 3.    *Ground Three*

Barnes contends that he was deprived of his constitutional right to effective assistance of counsel because his counsel, Richard Stafford, Esq., "failed to provide meaningful representation."  Dkt. 1 at 8.   He further contends that on one occasion at the jail, Mr. Stafford "never had a plan for [his] case."  Dkt. 17 at 3.

In addressing these contentions, the Appellate Division held that Barnes "failed to establish that he was deprived of the effective assistance of counsel."  *Barnes I*, 96 N.Y.S.3d at 862 (collecting cases).  Because this claim was adjudicated on the merits, the state court's decision must be "accorded substantial deference."  *Fischer*, 780 F.3d at 560 (citing *Dolphy*, 552 F.3d at 238).

In general, to prevail on a claim of ineffective assistance under federal law, a petitioner must (1) show that counsel's performance was so deficient as to fall below "an objective standard of reasonableness" and (2) establish prejudice by demonstrating

"a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). A "reasonable probability" requires "a 'substantial,' not just conceivable,' likelihood of a different result." *Cullen v. Pinholster*, 563 U.S. 170, 189 (2011) (quoting *Harrington*, 562 U.S. at 112). In the context of a habeas petition under 28 U.S.C. § 2254, "[e]stablishing that a state court's application of *Strickland* was unreasonable . . . is all the more difficult. The standards created by *Strickland* and § 2254(d) are both 'highly deferential' . . . and when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (collecting cases). Therefore, the "operative question in reviewing a state court's *Strickland* ruling is  . . . 'not whether a federal court believes the state court's determination was incorrect, but rather whether that determination was objectively unreasonable -- a substantially higher threshold.'" *Waiters*, 857 F.3d at 478 (alterations adopted) (quoting *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007)).

The standard to establish ineffective assistance of counsel under New York law is lower than under federal law. *See People v. Honghirun*, 78 N.E.3d 804, 807 (N.Y. 2017). In New York, a defendant must show only "that counsel failed to provide meaningful representation." *People v. Alvarez*, 125 N.E.3d 117, 120 (N.Y. 2019) (citing *People v. Stultz*, 810 N.E.2d 883 (N.Y. 2004); *People v. Baldi*, 429 N.E.2d 400, 405 (N.Y. 1981)). Unlike the federal standard, *see Strickland*, 466 U.S. at 694, under the state

standard, the defendant is not required to demonstrate that his counsel's ineffective assistance prejudiced him.  *See Alvarez*, 125 N.E.3d at 122.

Here, Barnes has not met the New York or federal standard.  As noted by the People, "the record reflects that [Barnes] was represented by an experienced attorney who had a legitimate trial strategy, made informed legal arguments, an appropriate opening statement, conducted relevant cross-examination of the People's witnesses -- including of several experts."  Dkt. 10-1 at 21.  Throughout the trial, Mr. Stafford made appropriate objections, and his summation appropriately addressed the relevant facts, evidence, and issues.  Mr. Stafford even "requested that the lesser-included charge be submitted to the jury."  *Id.* at 23.  In sum, the record shows that Mr. Stafford advocated vigorously on behalf of Barnes.  *See Harrington*, 562 U.S. at 791 ("[I]t is difficult to establish ineffective assistance when counsel's overall performance indicates active and capable advocacy.").

Accordingly, Barnes is not entitled to habeas relief on this basis.

### 4.    *Ground Four*

Barnes claims that his sentence -- 19 years to life -- is "unduly harsh and excessive and should be modified in the interest of justice."  Dkt. 1 at 9.

In addressing this claim, the Appellate Division held that "the sentence imposed was not excessive."  *Barnes I*, 96 N.Y.S.3d at 862 (citation omitted).  Because this

claim was adjudicated on the merits, the state court's decision must be "accorded

substantial deference." *Fischer*, 780 F.3d at 560 (citing *Dolphy*, 552 F.3d at 238).

 A persistent violent felony offender "is a person who stands convicted of a

violent felony offense as defined in subdivision one of section 70.02 . . . , after having

previously been subjected to two or more predicate violent felony convictions as

defined in paragraph (b) of subdivision one of section 70.04 of this article."  N.Y. Penal

Law § 70.08(1)(a); *see id.* § 70.02(1) (defining violent felony offense); *see also id.*

§ 70.04(1)(b) (outlining the criteria for determining whether a prior conviction is a

predicate violent felony conviction).

 Where, as here, the court has found that a person is a persistent violent

felony offender, it "must impose an indeterminate sentence of imprisonment, the

maximum term of which shall be life imprisonment.  The minimum period of

imprisonment under such sentence must be in accordance with subdivision three of this

section." *Id.* § 70.08(2).  "For a class D felony, the minimum period must be at least

twelve years and must not exceed twenty-five years." *Id.* § 70.08(3)(c).

 As an initial matter, in the Petition, Barnes does not contest that he is a

persistent violent felony offender.  Dkt. 1 at 9; *see also* Dkt. 9-19 at 2 (noting that, at

sentencing, Barnes also did not contest that he is a persistent violent felony offender).

And Barnes was convicted of assault in the second degree, a class D felony.  Dkt. 9-1 at 4, 33; N.Y. Penal Law § 120.05 ("Assault in the second degree is a class D felony.").

The court sentenced Barnes to 19 years to life, which is well within the range set out in the statute.  N.Y. Penal Law § 70.08(3)(c).  Thus, Barnes's claim fails.  It is well settled that "[n]o federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law."  *White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) (per curiam) (citation omitted); *see, e.g.*, *Taylor v. Connelly*, 18 F. Supp. 3d 242, 268 (E.D.N.Y. 2014) (same) (collecting cases).  Moreover, the sentence was in any event reasonable -- Barnes stabbed someone in the neck, and this was at least his third violent felony conviction.

Accordingly, Barnes is not entitled to habeas relief on this basis.

## CONCLUSION

Barnes has failed to show any basis for relief under 28 U.S.C. § 2254.

Accordingly, the Petition is denied.  Additionally, I decline to issue a certificate of

appealability because Barnes has not made a substantial showing of the denial of a

constitutional right.  *See* 28 U.S.C. § 2253(c)(2).  Pursuant to 28 U.S.C. § 1915(a)(3), I

certify that any appeal taken from this decision and order would not be taken in good

faith.

The Clerk of Court is respectfully directed to mail a copy of this

memorandum decision and the judgment to Barnes at his last address of record.

SO ORDERED.

Dated:      New York, New York
            August 23, 2024

_____
DENNY CHIN
United States Circuit Judge
Sitting By Designation